UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                           :

AXELROD & CHERVENY ARCHITECTS,    :
P.C.,                                 :

                              :        **MEMORANDUM AND ORDER**
               Plaintiff,         :
                              :

        - against -             :        2:05-cv-711-ENV-ETB
                              :

WINMAR HOMES and ANTHONY MARTINO,  :
                              :

             Defendants.      :
                              :
-------------------------------------------------------------X

VITALIANO, D.J.

      Plaintiff Axelrod & Cherveny Architects, P.C. ("Axelrod & Cherveny") brings this action

against defendants Winmar Homes ("Winmar"), a residential building company, and Anthony

Martino ("Martino"), the president and half-owner of Winmar, alleging that defendants

misappropriated one of its home designs that is protected under the Architectural Works

Copyright Protection Act, Pub. L. No. 101-650, §§ 701-706, 104 Stat. 5089, 5133-34 (1990)

(codified in scattered sections of 17 U.S.C.).  All parties have moved for summary judgment.

For the reasons set forth, defendants' motion for summary judgment is granted in part and denied

in part, and plaintiff's cross-motion for summary judgment on liability for copyright

infringement is granted in its entirety.

## BACKGROUND

      The facts surrounding defendants' infringement are straightforward and largely

undisputed.  Glen Cherveny has testified that, in or around October 1996, he authored the design

for a home that was later built in Suffolk County, New York.  The design was entitled "Island

Estates at Setauket Canterbury, Canterbury 96027" ("Canterbury Design"). On December 29, 2003, Axelrod & Cherveny was issued a certificate of copyright registration (No. VAu607-406) for the Canterbury Design.

Defendant Winmar is a Suffolk County contractor that builds single-family residences. (Martino Aff. ¶ 2.) In early 2002, Winmar was acting as the general contractor for a development of new residential homes in Sayville. Chris Capitelli, a real estate agent, was involved in advertising and/or marketing the Sayville properties. In May 2002, Capitelli met with prospective buyers Khairunnisa and Ali Malik, who were responding to his internet advertisement. The Maliks had earlier and independently come upon a home built with the Canterbury Design. They showed Capitelli a marketing brochure, floor plan, and pictures of the Canterbury Design and asked if Winmar could build a similar home at its development in Sayville. Capitelli, in turn, faxed the Canterbury materials to Winmar's president, Martino, who subsequently met with the Maliks. (Martino Dep. at 27-29.) The Maliks showed Martino a picture of the Canterbury Design and again asked if Winmar could build something similar. (Id. at 52-53 ("They took the picture, the snapshot picture was taken from somebody's house. That's exactly what they wanted, the color and everything."); A. Malik Dep. at 17.) Martino responded by showing the Maliks what he thought was a similar plan, called "the Federico," which was dated May 12, 1998, but which lacked any indicia of authorship or copyright.[1] (Martino Dep. at 51.) Martino suggested that the Maliks meet with Joseph Cacioppo, an architect who prepared the designs of 18 of the 19 homes built at the Winmar development. (Id. at 24.) They later met

_____

[1] Though he had the Federico on file, Martino could not recall, at his deposition, from whom he had received the plan. Winmar had never used the rough and preliminary plan to actually build a home.

with Cacioppo, who then designed a plan for the Maliks based on their discussions, a picture of the Canterbury Design, and materials pertaining to the Federico Design. (A. Malik Dep. at 26.)[2] Cacioppo's finished plan, with an attached copyright notice, is dated August 23, 2002. As conceded by all parties and discussed *infra*, Cacioppo's design is very similar to the Canterbury Design.

On October 20, 2002, the Maliks entered into a contract with Winmar to build the Cacioppo-designed home at the Sayville development. It is uncontested that Axelrod & Cherveny never authorized or otherwise consented to Winmar or Caccioppo utilizing the Canterbury Design to build the Malik home. In fact, Axelrod & Cherveny had no awareness of the home until after it was built, when, in or around November 2004, Glen Cherveny happened to drive into the development in Sayville. There, he observed the Maliks's home, which he thought was identical to his Canterbury Design. (Cherveny Aff. ¶ 6.) Cherveny obtained the home's building permit and plans from the Town of Islip, and after reviewing those documents, determined that the Sayville home was substantially similar, if not identical, to his Canterbury Design. (Id. ¶¶ 9, 13.) Axelrod & Cherveny brought this suit on February 4, 2005 against defendants Winmar Homes and Anthony Martino, alleging copyright infringement. Defendants are now moving for summary judgment on all of Axelrod & Cherveny's claims[3] and Axelrod &

---

[2] Based on the record before the Court, there is no direct evidence that the Maliks provided Cacioppo with brochures and floor plans of the Canterbury Design. (Cacioppo Dep. at 31.)

[3] Axelrod & Cherveny also brought state law claims and a claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). At oral argument, Axelrod & Cherveny's counsel conceded that dismissal of these claims was appropriate. (Transcript of Oral Argument, Nov. 30, 2006, at 3.) Accordingly, defendants' motion for summary judgment is granted as to these claims, which are hereby dismissed.

Cherveny is cross-moving for summary judgment on its copyright infringement claim.

## DISCUSSION

### Architectural Works Copyright Protection Act

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). With the passage of the Architectural Works Copyright Protection Act in 1990, architectural works were added to the list of copyrightable works of authorship. 17 U.S.C. § 102(a)(8). The Copyright Act defines an architectural work as

> the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101. According to the legislative history of the Architectural Works Copyright Protection Act,

> [t]he phrase "arrangement and composition of spaces and elements" recognizes that: (1) creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole; (2) an architect may incorporate new, protectible design elements into otherwise standard, unprotectible building features; and (3) interior architecture may be protected.

H.R. Rep. No. 101-375 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 6935, 6949. Under current law, architectural works are generally subject to the same standards as other copyrightable works. See Attia v. Soc'y of the N.Y. Hosp., 201 F.3d 50, 53 n.3 (2d Cir. 1999) (citing 1

4

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT ("NIMMER ON COPYRIGHT") §

2.20, at 2-216 (1998)); <u>Shine v. Childs</u>, 382 F. Supp. 2d 602, 608 (S.D.N.Y. 2005).

**Certificate of Copyright Registration**

Registration is a prerequisite to bringing suit for copyright infringement.  17 U.S.C. §

411.  Defendants contend, at threshold but at length, that Axelrod & Cherveny never registered

its copyright in the Canterbury Design as an architectural work; instead, they claim, Axelrod &

Cherveny has only registered its copyright in the technical drawings that depict the Canterbury

Design.  Though an author may obtain a copyright certificate for both an architectural work and

the blueprints that depict the work, each item must be registered separately, and an author must

submit a separate registration form, Form VA, for each:

> (3) Applications form.  Registration should be sought on Form VA.
> Line one of the form should give the title of the building.  The date
> of construction of the building, if any, should also be designated.  If
> the building has not yet been constructed, the notation "not yet
> constructed" should be given following the title.
>
> (4) Separate registration for plans. Where dual copyright claims exist
> in technical drawings and the architectural work depicted in the
> drawings, any claims with respect to the technical drawings and
> architectural work must be registered separately.

37 C.F.R. § 202.11(c).  In attempting to show that Axelrod & Cherveny's copyright is in the

blueprints, defendants argue that the Court need look no further than Axelrod & Cherveny's

registration form,[4]  which, in the "nature of work" space, clearly and explicitly states

---

[4]  The Form VA completed by Axelrod & Cherveny is similar in appearance to the current Form VA, which can be accessed at http://www.copyright.gov/forms/formva.pdf

"blueprints".[5]

Axelrod & Cherveny counters that the words contained within the "nature of work" space should not be dispositive. Instead, Axelrod & Cherveny proposes that the Court look to a separate section of the Form VA where an applicant has a choice of boxes to check, with each box representing a different "nature of authorship". There, Axelrod & Cherveny had the choice of choosing either a box for "architectural work" or for "technical drawing". It chose "architectural work". Axelrod & Cherveny explains that "blueprints" was written in the "nature of work" space only to indicate what type of item was being submitted as a depiction of the architectural work.

It is well established that a mere innocent error in classification will not ordinarily, in itself, "invalidate or impair copyright protection." L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 490 n.2 (2d Cir. 1976); Hamil America, Inc. v. GFI, 193 F.3d 92, 99 (2d Cir. 1999) ("[C]ourts have consistently permitted a plaintiff to correct a defective recordation, and to go forward with the suit as of the date of the filing of the action.") (quoting Northern Songs, Ltd. v. Distinguished Prods., Inc., 581 F. Supp. 638, 641 (S.D.N.Y. 1984)) (alteration in original); see also 2 NIMMER ON COPYRIGHT § 7.20[A] (2006) (characterizing an error in classification as the type of error that the Copyright Office may correct on its own initiative). But, invalidation for error is an issue that the Court need not reach on the facts here.

---

[5] As defendants point out, the Copyright Office's online database supports this conclusion, as it indicates that the Canterbury Design is on file as an "architectural work[] in which the drawings only are being claimed" as opposed to an "architectural work[] in which the underlying work is being claimed." However, the Court does not weigh this classification in its analysis because "[t]he administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided . . . ." 17 U.S.C. § 408(c)(1).

Indeed, this very circumstance was addressed and resolved by the Copyright Office in its response to the Third Circuit's decision in <u>Raquel v. Educ. Mgmt. Corp.</u>, 196 F.3d 171 (3d Cir. 1999), *vacated*, 531 U.S. 952 (2000). In <u>Raquel</u>, as here, the plaintiff had misidentified the nature of its copyright in the "nature of work" space but correctly identified the nature of its copyright in the "nature of authorship" space. <u>Id.</u> at 178 n.3. The majority held that the material misstatement in the "nature of work" space failed to give adequate notice to the Copyright Office of exactly what type of copyright plaintiff had claimed. <u>Id.</u> at 178-79. As such, the circuit court affirmed the district court's dismissal of the action. <u>Id.</u> at 182. In attempting to distinguish the long line of cases where courts have held that inadvertent errors do not warrant dismissal of an infringement action, the majority reasoned that: (i) plaintiff's error went to the very nature of the copyright; (ii) plaintiff's error was more material because it mistakenly identified a copyright that plaintiff had not authored, and thus (iii) the certificate would have been rejected if the Copyright Office had investigated further. <u>Id.</u> at 177-78.

First, the <u>Raquel</u> majority misapplied the law. In dissent, then-Judge Alito, relying on Second Circuit precedent, argued that the majority's approach elevated form over substance:

> The majority attempts to distinguish this long line of cases by pointing to the fact that Raquel's registration misidentified the nature of the work in question. This argument mischaracterizes the case law. No court of appeals has ever suggested that an inadvertent error in a registration statement-even an error as to the nature of the work-can bar an infringement action where the work would have been copyrightable had the registration statement contained a correct statement of facts. Indeed, in <u>Baron v. Leo Feist, Inc.</u>, 173 F.2d 288 (2d Cir. 1949), the Second Circuit dealt with precisely the issue of misidentification of the nature of a copyrighted work in its registration. In <u>Feist</u>, the plaintiff's registration certificate referred

only to the arrangement of the subject song. Nevertheless, the
Second Circuit held that the registration was sufficient to maintain an
action based on infringement of the song's melody because there was
no contention that the defendants were "misled by the certificate of
registration."

Id. at 184-85 (internal citations omitted). This dissenting view is in full accord with the

longstanding copyright principle that, since "registration is not a condition of copyright

protection," see 17 U.S.C. § 408(a), courts should not treat the registration requirement as a

technical trap, and inadvertent mistakes should only become an issue when they are

detrimentally relied upon.

Second, as a factual matter, the Raquel majority overvalued the significance of the

plaintiff's "misstatement." In response to the Third Circuit's decision, the Copyright Office

issued a statement of policy to avoid "the possibility that other courts will rely on Raquel as

valid precedent for invalidating copyright registrations under similar circumstances." In

pertinent part, the Copyright Office announced:

The Office is also issuing this statement to clarify that in the "nature
of this work" space on Form PA, it has been and continues to be
acceptable to describe the physical nature of the deposit submitted
with the application.

While section 409 of the copyright law largely dictates the content of
the application form, this statutory section does not require a
nature-of-work space. This space was added to the PA and VA forms
because these forms cover a number of different categories of works,
and it was believed the additional information would clarify the
general character or the type or category of the work being registered.
In practice, however, the information provided in this space by
applicants often does not relate to the nature of the claim; and the
Office's practice has always been to look to the "nature of

8

authorship" statement in space 2 as the primary source of such information. See Compendium of Copyright Office Practices, Compendium II ("Compendium II"), § 619 (1988) ( "In general, the nature of authorship defines the scope of the registration; therefore, it represents an important copyright fact"). If, on the basis of the deposit and the nature of authorship statement, the nature of the copyright claim is clear, the Copyright Office will proceed with registration.

Ideally, the nature-of-work space should describe the work being registered. In practice, it has served a variety of functions, e.g., as a substitute for the statement of authorship (when such a statement was lacking) or as a supplementary description augmenting the statement of authorship. It has also served as a description of the physical nature of the deposit, and the Office has treated such a statement as acceptable where the nature of authorship statement and deposit make clear the scope of the copyright claim being registered. The Compendium establishes this policy in the following language: "Forms PA and VA contain a nature-of-work space. This space should give a description of the general nature and character of the work being registered. A description of the physical form of the work is generally acceptable. Ordinarily, the Copyright Office will not consider the omission or incorrect completion of information in the nature-of-work space as a reason, in itself, for communicating with the applicant . . . ." Compendium II, § 614.

Copyright Office Statement of Policy, 65 F.R. 41508-01, 2000 WL 872412 (Jul. 5, 2000).

Given the announced policy statement of the Copyright Office and its harmony with caselaw other than <u>Raquel</u>, Axelrod & Cherveny's alleged "misstatement" in its copyright registration form was not at law an error at all. In fact, the filing was "appropriate". If there is anything to take from Copyright Office's Statement of Policy, it is that when there is a perceived disparity between the listing in the "nature of the work" and "nature of authorship" sections of Forms VA or PA, the latter should be treated as controlling. Accordingly, this Court concludes,

as a matter of law, that Axelrod & Cherveny has registered its architectural copyright in the Canterbury Design and is entitled to maintain its infringement suit.[6]

### Failure to Name a Necessary and Indispensable Party

Defendants raise another threshold issue by contending that Axelrod & Cherveny's complaint should be dismissed due to its failure to name Cacioppo, the architect, as a defendant. A party is "necessary" to a litigation if: "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."  Fed. R. Civ. P. 19(a). Courts are loath to dismiss cases for non-joinder of a party, and will only do so to avoid serious prejudice and inefficiency.  Owens-Illinois, Inc. v. Meade, 186 F.3d 435, 441 (4th Cir. 1999).

Defendants raised this issue for the first time in opposing summary judgment.  More importantly, they make no showing that the absence of Cacioppo from this case will lead to any prejudice or inefficiency.  On this point, the Court notes that resolution of this action will not be dispositive against the third party, Cacioppo, if he seeks to assert his own copyright claim regarding the plans that he drew.  Further, it is well established that in the ordinary copyright

---

[6] As such, much of defendants' case is undercut.  Defendants rely heavily upon Patriot Homes, Inc. v. Forest River Hous., Inc., No. 3:05-CV-0471, 2006 WL 1752143 (N.D. Ind. Jun. 21, 2006). Patriot Homes is inapposite here, however, because the copyright holder in that case never alleged that it had an architectural works copyright, but instead conceded, in its complaint, that it was seeking to protect a copyright that was limited to technical drawings.  Id. at *7.

suit, a plaintiff need not join all infringers; the plaintiff may sue any of the defendants since they are jointly and severally liable.  See 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1614, at 227 (3d ed. 2001); Jonesfilm v. Lion Gate Int'l, 299 F.3d 134, 140 n.1 (2d Cir. 2002).  The Court thus rejects defendants' bald assertion that dismissal is proper due to Axelrod & Cherveny's failure to name Cacioppo as a defendant.

### Direct and Derivative Liability

Seeking desperately to avoid adjudication on the ultimate issue of copyright infringement, defendants raise a third preliminary issue.  They argue that, even if the Canterbury Design was infringed upon, the only person who can be held liable is Cacioppo, because he actually produced the blueprints for the Winmar home.  As the argument goes, "Winmar simply built the home pursuant to the Cacioppo copyrighted plans" and "Winmar and Martino were not involved in the creation of the design and/or blueprints."  Unfortunately for defendants, the law draws no such distinction.

The Architectural Works Copyright Protection Act defines infringement to include the unauthorized copying of an architectural work.  Liability under the Copyright Act is not limited to actors who draw the blueprints of a structure, nor should the statute be read in such a way.  The most egregious examples of structural infringement will not involve an infringing architect; they will involve an infringing builder who simply steals an architect's design.  Direct liability under the Copyright Act can therefore extend to at least a builder.  See Arthur Rutenberg Homes, Inc. v. Maloney, 891 F. Supp. 1560, 1568 (M.D. Fla. 1995) (holding that both a homeowner and builder were liable as direct infringers due to their involvement in the design and construction of

a residential home).

Further, defendants' claimed lack of intent – the innocent infringer defense – will not bar a finding of infringement.  See Fitzgerald Publ'n Co. v. Baylor Publ'n Co., 807 F.2d 1110, 1113 (2d Cir. 1986) ("Even an innocent infringer is liable for infringement."); John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1, 13 (D. Mass. 2002) (citing Lipton v. Nature Co., 71 F.3d 464 (2d Cir. 1995)); 4 NIMMER ON COPYRIGHT § 13.08 (2006) ("Then there is the situation where the defendant's work is based upon a work furnished by a third party.  The defendant's ignorance that such third party has wrongfully copied from the plaintiff will not immunize him from liability.").  Defendants cite no contrary authority.  But, even further, given the undisputed facts surrounding defendants' alleged infringement of the Canterbury Design, it can hardly be said that they lacked knowledge.  Defendant Martino admitted as much at his deposition.  When asked if he had ever thought about the origin of the design the Maliks had asked him to recreate, Martino responded, "I wasn't interested in where it came from."  (Martino Dep. at 50.)  Martino, however, was clearly aware that he was recreating a home that existed elsewhere.  It matters not that he did not think too much about it.  Defendants may clearly be held liable as builders.[7]

---

[7]  Apart from their liability as direct infringers, defendants may be held liable as contributory infringers.  The general rule is that a party "who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 40 (2d Cir. 2005) (quoting Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)).  Defendants' acts with regard to the architect, Cacioppo, or even the homeowners, the Maliks, might alone be sufficient to establish such derivative liability.  However, the Court need not and does not reach this issue.

## Summary Judgment Standard

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding, based on the pleadings, depositions, interrogatory answers, admissions, and affidavits that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). In determining whether the moving party has met this burden, a court must construe all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Ultimately, the Court is left to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## Copyright Infringement

Under the Copyright Act, a party seeking to establish infringement must prove: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are

original." Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). To prove "copying of constituent elements of the work that are original," the copyright owner must show that: (1) defendant actually copied the work; and (2) there are substantial similarities between the works that are probative of copying. See Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003); Hamil America, Inc. v. GFI, 193 F.3d 92, 99 (2d Cir. 1999). Given the obvious fact-based nature of this inquiry, a grant of summary judgment on a claim of copyright infringement is exceedingly rare. A plaintiff must show that no reasonable trier of fact could find against it on any of the elements of proof, the most challenging of which may be proof of substantial similarity. As the Second Circuit has noted, "[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980); Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966).

Nevertheless, summary judgment remains available and is appropriate where the degree of substantial similarity is overwhelming. 3 NIMMER ON COPYRIGHT § 12.10[B][3] (2003) (grant of summary judgment to plaintiff is appropriate where substantial similarity is overwhelming, precluding finding of independent creation). District courts, therefore, have been willing to grant plaintiffs summary judgment in the architectural realm where, as here, no doubt exists that the offending structure is a knock off. See, e.g., Nilson v. McGlaughon, 02-cv-54, 2004 WL 906322 (E.D.N.C. Mar. 19, 2004); Bonner v. Dawson, No. 502-cv-00065, 2003 WL 22432941 (W.D. Va. Oct. 14, 2003).

I.      *Ownership of a Valid Copyright*

Under the Copyright Act, a plaintiff bears the burden of showing ownership of a valid copyright. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 108-09 (2d Cir. 2001). The burden, though, is substantially lightened by statutory law providing that a certificate of registration issued within five years of a work's publication is *prima facie* evidence of a valid copyright and thus gives rise to a rebuttable presumption of validity. 17 U.S.C. § 410(c). Even a certificate of registration issued outside the five-year window may be treated by a court as *prima facie* evidence of validity. See Telerate Sys., Inc. v. Caro, 689 F. Supp. 221, 227 n.7 (S.D.N.Y. 1988).

Here, the Copyright Office issued a certificate of registration for the Canterbury Design seven years after its initial publication, as it was, by plaintiff's own acknowledgment, published on October 5, 1996 and registered on December 29, 2003. As evidence of authorship, Axelrod & Cherveny has offered the deposition testimony of Glen Cherveny, who testified that he independently created the Canterbury Design in 1996. Cherveny has produced the plans that he drafted. (Cherveny Dep. at 28.) None of this is disputed by admissible proof. Moreover, there is also no dispute that the Canterbury Design was used to build the home that the Maliks had taken a picture of and wanted to have recreated. Simply, there is no doubt that the Canterbury Design predates the Malik home, which was contracted for in 2002 and completed in 2003.

These facts alone do not short circuit inquiry. Defendants argue on that Axelrod & Cherveny does not have a valid copyright in the Canterbury Design because the design is unoriginal. Originality is an indispensable prerequisite to copyrightability. Kamar Int'l, Inc. v. Russ Berrie and Co., 657 F.2d 1059, 1061 (9th Cir. 1981). But, under the Copyright Act, the

term "originality" has a meaning different from its ordinary usage; it "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (citing NIMMER ON COPYRIGHT §§ 2.01[A], [B] (1990)); Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 764-65 (2d Cir. 1991); Weissmann v. Freeman, 868 F.2d 1313, 1321 (2d Cir. 1989); Gaste v. Kaiserman, 863 F.2d 1061, 1066 (2d Cir. 1988); Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 102-03 (2d Cir. 1951) ("All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'"). Practically speaking, because the degree of creativity required is so low, the originality requirement amounts to "little more than a prohibition of actual copying." Alfred Bell & Co., 191 F.2d at 103; Boisson v. Banian, Ltd., 273 F.3d 262, 270 (2d Cir. 2001) ("Absent evidence of copying, an author is entitled to copyright protection for an independently produced original work despite its identical nature to a prior work, because it is independent creation, and not novelty that is required." ) (citing 1 NIMMER ON COPYRIGHT § 2.01[A]); see also Kamar Int'l, 657 F.2d at 1061 ("Anyone can copyright anything, if he adds something original to its expression."). For better or worse, courts have not required an "especially elevated" level of originality in the architectural realm. See John Alden Homes, Inc. v. Kangas, 142 F. Supp. 2d 1338, 1343 (M.D. Fla. 2001); Arthur Rutenberg Homes, Inc. v. Maloney, 891 F. Supp. 1560, 1566 (M.D. Fla. 1995) (citing 1 NIMMER ON COPYRIGHT §§ 2.01[A], 2.20 (1992)); Shine, 382 F. Supp. 2d at 610-11; Yankee Candle Co. v. New England Candle Co., 14 F. Supp. 2d 154, 158

(D. Mass. 1998) ("Courts have routinely protected modern architectural structures, such as commercial homes, that possess the minimal amount of originality that copyright law requires, as well as the plans from which owners built them."); Richmond Homes Mgmt., Inc. v. Raintree, Inc., 862 F. Supp. 1517, 1524 (W.D. Va.), *rev'd on other grounds*, 66 F.3d 316 (4th Cir. 1994); Value Group, Inc. v. Mendham Lake Estates, L.P., 800 F Supp. 1228, 1232 (D.N.J. 1992). In a nutshell, the current cases "indicate that the courts will continue to interpret the AWCPA as providing a broad scope of protection for most forms of architecture, whether the 'high art' of an internationally famous practitioner or the more pedestrian model-home designed by the bread-and-butter architect." Antoinette Vacca, Comment, The Architectural Works Copyright Protection Act: Much Ado About Something?, 9 MARQ. INTELL. PROP. L. REV. 111, 130 (2005). Defendants advance no contrary authority on this point.

Seeking to raise a genuine issue of material fact as to originality in any way possible, defendants appear to present two separate arguments. First, defendants contend that there is an issue as to whether Cherveny independently authored the Canterbury Design. Second, defendants contend that, even if Cherveny independently authored the Canterbury Design, the work is still not entitled to protection, as it is so generic as to be undeserving of copyright protection.

In arguing that the Canterbury Design was not independently authored, defendants point to the Federico plan, which is somewhat similar, and assert that its mere existence is sufficient to raise a reasonable inference that Cherveny did not independently author the Canterbury Design. The Court disagrees. Even to the untrained eye, there are appreciable differences between the

two designs.  Most notably, the Federico plan has garage doors facing the front of the home, while the Canterbury Design does not.  But more to the point, assuming for the purpose of argument that the plans are similar, defendants not only fail to offer a shred of evidence from which one could conclude that Cherveny copied the Federico, they offer evidence that solidly establishes he did not.  The very rough Federico plan submitted on the motion bears no indicia of authorship and, as defendants concede, has not been copyrighted.  The Federico plan is alleged to have been authored in 1998; defendants offer no admissible evidence whatsoever to challenge the fact that the Canterbury Design was initially authored two years earlier.  Defendants do not contend that they or anyone else ever used the Federico plan to build a home at any time, much less before the Canterbury Design was authored.  Further, defendants' proof indicates that the Federico plan was stored in a file at Winmar's office; defendants offer no theory much less proof of how Cherveny could have accessed and copied the plan.  In sum, the mere existence of the Federico plan is of no evidentiary value.  The mere existence of one similar home design of unproved origin, which was not used to build a house and which did not exist at the time the copyrighted design was authored, is hardly enough to raise in and of itself a reasonable inference that the Canterbury Design was not independently created.  Alone, the Federico plan is clearly insufficient to create a triable issue.  See Key Publ'ns, Inc. v. Chinatown Today Publ'n Enters., Inc., 945 F.2d 509, 513 (2d Cir. 1991) ("Similarity to prior works will not, in and of itself, affect the validity of a particular work's copyright."); Gibson Tex, Inc. v. Sears Roebuck & Co., 11 F. Supp. 2d 439, 443 (S.D.N.Y. 1998) (finding a design to be original where its resemblance to another design "although close," was "not exactly the same"); 3 NIMMER ON COPYRIGHT §

12.11[1] (2006).  To survive summary judgment on this issue, defendants must offer something more.  They do not.

On a different flank, defendants also contend that the Canterbury Design is so generic as to lack the minimal level of creativity needed to constitute an original work under the Copyright Act.  To be eligible for copyright protection, "an architectural work must exhibit some modicum of creativity."  <u>Value Group, Inc.</u>, 800 F Supp. at 1232 (D.N.J. 1992).  The architectural work need not be novel; bluntly, the vast majority of works qualify, "no matter how crude, humble, or obvious."  <u>Id.</u> (citing <u>Feist Publ'ns</u>, 499 U.S. at 345).  Pressing their contention, defendants argue that the Canterbury Design's interior layout is very similar to that of many other residential homes and, specifically, to one of Winmar's other designs – the Lisa.

A mere similarity in layout, if found, would not, however, establish a genuine issue with respect to originality.  In passing the Architectural Works Copyright Protection Act, Congress was aware that protected architectural works would inevitably contain many non-protected component parts.  <u>See</u> H.R. Rep. No. 101-375, *reprinted in* 1990 U.S.C.C.A.N. at 6949 ("[C]reativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole . . . ."); <u>Shine</u>, 382 F. Supp. 2d at 609.  Layout is just one aspect of the Canterbury Design.  "The aspect of architectural design that is protected is the gestalt of the plans including things like an architect's choices regarding shape, arrangement, and location of buildings, the design of open space, the location of parking and sidewalks, and the combination of individual design elements."  <u>Greenberg v. Town of Falmouth</u>, No. 04-cv-11934, 2006 WL 297225, at *3 (D. Mass. Feb. 8,

2006) (citing <u>John G. Danielson</u>, 186 F. Supp. 2d at 10).  While its components may look like those in many other modern homes, the Canterbury Design's gestalt – its overall feeling, shape and arrangement of spaces, windows, and doors – helps to distinguish it from those other homes. Defendants merely offer limited proof as to the similarity of one component and no proof that the overall Canterbury Design was generic or lacked creativity.  The Canterbury Design clearly meets the very low threshold of creativity required for protection under the Copyright Act.  <u>Cf.</u> <u>Richmond Homes Mgmt., Inc.</u>, 862 F. Supp. at 1524 (refusing to find lack of creativity necessary for copyright protection where defendants' expert gave vague statements that residential home was generic and similar to many others in area).  A reasonable jury could not find otherwise.

II.      *Copying*

At summary judgment, it is typically more difficult for a plaintiff to establish the next element – "copying of constituent elements of the work that are original."  It is "a difficult but not impossible task," <u>John G. Danielson</u>, 186 F. Supp. 2d at 9, and certainly not impossible here where defendants concede that the Malik home not only looks very similar to the Canterbury Design but was, in fact, copied from it.  Caselaw, of course, recognizes that "[b]ecause direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyrighted material.'" <u>Jorgensen</u>, 351 F.3d at 51 (quoting <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1249 (11th Cir. 1999)).  A factual finding of access may be based upon a finding that the infringer had a reasonable probability of seeing the prior work, and thus had an opportunity to copy it.  <u>See</u> <u>Jorgensen</u>, 351 F.3d at 51; <u>Silberstein v. Fox Entm't Group, Inc.</u>, No. 02-cv-1131,

2004 WL 1620895, at *5 (S.D.N.Y. Jul. 19, 2004). Defendants' own proof, to their detriment, establishes this opportunity to copy and more.

Specifically, defendant Martino openly concedes that he was approached by the Maliks who "wanted a house built that would be similar to the one in the photograph [the Canterbury Design]." (Martino Aff. ¶ 6.) At another point, Martino testified that the picture submitted by the Maliks was "exactly what they wanted, the color and everything." (Martino Dep. at 52-53.) This comports with the testimony of Khairunnisa Malik, who testified that "[w]e had a picture of a house actually and we showed [Chris Capitelli] that, that this is what we basically want. So that's what we did." (K. Malik Dep. at 10.) Defendants further openly acknowledge that they had access to more than just the general idea of the Canterbury Design. Indeed, it is undisputed that Martino was provided with a photograph, marketing brochure, and floor plan of the Canterbury Design. The testimony is also unquestioned that at least the photograph of the Canterbury Design was forwarded by defendants to the architect, Cacioppo, who subsequently provided the building plan for the home.

Neither is there a factual dispute that Cacioppo succeeded in his assigned task – to design a home for the Maliks virtually identical to the Canterbury Design. Martino's testimony punctuates the proof:

> Q: When the Maliks had shown you the photographs [of the Canterbury Design home], which is Plaintiff's Exhibit 2, was it your understanding that they wanted Winmar to construct the home identical to what's shown in Plaintiff's Exhibit 2?
>
> A: Yes.
>
> Q: And did you say they wanted everything down to the color, too?

21

| A: | Exactly. |
|---|---|
| Q: | Is that what Winmar Homes built? |
| A: | Yes. |
| Q: | So the house that was built on Kemi Lane is identical to the house that's shown in this? |
| A: | Almost pretty much the color and the roof is the same, siding is the same. |

(Martino Dep. at 70-71.) As to these points, defense counsel's statements are similar:

| THE COURT: | Is there an issue of fact . . . [that] the home that defendants build is really different from what was copyrighted as a design? Is there an issue there? |
|---|---|
| COUNSEL: | Well, I think it's a question of fact, Judge. I'm not gonna deny that they're similar. |
| THE COURT: | Right. |
| COUNSEL: | *They are similar.* |
| . . . . | |
| THE COURT: | Is the silhouette identical or similar? |
| COUNSEL: | Well, I think there is a difference in the roof line, and there is – I think, there's a different in the footprint in the back of the house. I'm not sure Your Honor, but I think that's the case. |
| THE COURT: | You're talking about landscaping – |
| COUNSEL: | No. |
| THE COURT: | – or are you talking about – |
| COUNSEL: | I'm talking about the foundation of the house. I think it's pushed out more, and – *but it's very similar, and the architect testified that he actually designed this house, based on the photograph, the sketch, the blueprints, and, from that, he did the house. He did do the house to look like what was in the photograph.* |

(Transcript of Oral Argument, Nov. 30, 2006, at 10-12, emphasis added.)

Front and center to a finding of infringement is the issue of "substantial similarity". In assessing substantial similarity, a factfinder applies the "ordinary observer test" and asks "whether an average lay observer would overlook any dissimilarities between the works and would conclude that one was copied from the other." Nihon Keizai Shimbum, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 70 (2d Cir. 1999). In applying the ordinary observer test, "[g]ood eyes and common sense may be as useful as deep study of reported and unreported cases, which themselves are tied to highly particularized facts." Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc., 490 F.2d 1092, 1093 (2d Cir.1974) (quoting Couleur Int'l Ltd. v. Opulent Fabrics Inc., 330 F. Supp. 152, 153 (1971)). The factfinder must look at the work as a whole without dissection. Tienshan, Inc. v. C.C.A. Int'l (N.J.), Inc., 895 F. Supp. 651, 658 (S.D.N.Y. 1995). This entails judging the "total concept and feel" of the structure, and a factfinder must avoid taking a divide and conquer approach in assessing elements of the work. See Shine, 382 F. Supp. 2d at 612; Sturdza v. United Arab Emirates, 281 F.3d 1287, 1299 (D.C. Cir. 2002) (reversing district court's grant of summary judgment to defendant where a reasonable jury could conclude that the "overall look and feel" of structures was substantially similar).[8]

This case presents the rare instance where a court can determine, based on the parties' submissions alone, that two works are substantially similar as a matter of law. As in other architectural copyright cases where courts have granted summary judgment in favor of the

---

[8] The Second Circuit has yet to apply the substantial similarity test in the realm of architectural works, see Shine, 382 F. Supp. 2d at 612, but there is no reason to believe that it would not apply the "look and feel" approach.

plaintiff, this is a case where a picture is worth a thousand words.  <u>Bonner</u>, 2003 WL 22432941, at *5; <u>John G. Danielson</u>, 186 F. Supp. 2d at 14.  Even the briefest perusal of the materials depicting the fronts of the Canterbury Design and Malik home reveals their striking similarity; in fact, they are virtually identical.  The double doorway, garage, and chimney are each in the precise same location of each home.  Each home has sixteen identically-placed windows.  The intricately patterned panes of the windows, some of which extend outward on circular windows giving the impression of rays of sunlight, are also nearly identical.  Each home has the same unique mix of stonework and paneling.  Notably, the center segment of each home is stone and both give way to protruding paneled alcoves.  Most striking, however, is the combination of shapes that compose the front silhouette of each home.

And the similarities do not stop at the front door.  A review of the blueprints shows that, as defense counsel has conceded, both homes have nearly identical interior layouts too.  Trying to explain away the similarity, defendants argue that there are only so many ways to arrange a two-story four-bedroom home.  The Court agrees.  But, nonetheless, the ten rooms, garage, foyer, three bathrooms, fireplace, and stairway are almost identical in size and shape, and are placed in the same exact manner in relation to one another – another picture worth a thousand words.  There are, however, a few of defendants' words that are worth as much as the pictures. They are defendants' words of concession; words that establish that the striking similarity in design is no accident, coincidence, or surprise.  The Malik home is nearly identical to the Canterbury Design **because** defendants had access to everything needed to copy the design and were specifically contracted by the Maliks to do so.

Caselaw in this circuit on the Architectural Works Copyright Protection Act remains sparse. Yet, if the Act is to have any meaning in the context of residential homes, then summary judgment must be mandated in a case like this, where the interior and exterior of two homes are virtually identical in shape and layout and where the alleged infringers' concessions establish copying. Defendants' copying of the Canterbury Design is pervasive, unabashed, and unauthorized. This Court finds on the submissions of the parties that there is no genuine issue of material fact: the home built by defendants for the Maliks was copied from and substantially similar to plaintiff's Canterbury Design. Accordingly, the Court holds that defendants have infringed plaintiff's copyright in the Canterbury Design as a matter of law.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted to the extent that plaintiff's trademark and state law claims are dismissed. On plaintiff's copyright claim, defendants' motion for summary judgment is denied and plaintiff's cross-motion is granted to the extent that defendants are adjudged liable for their infringement of the Canterbury Design. The parties shall appear before the Court on March 30, 2007 at 3:30 p.m. to set a trial date for the damages phase of this case.

**SO ORDERED.**

Dated: Brooklyn, New York
March 6, 2007

/ s / Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge